ERIN E. SCHNEIDER (CA Bar No. 216114)
MONIQUE C. WINKLER (CA Bar No. 213031)
JOHN S. YUN (CA Bar No. 112260)
 E-mail: yunj@sec.gov
JASON H. LEE (CA Bar No. 253140)
STEVE VARHOLIK (CA Bar No. 221554)
 E-mail: varholiks@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA
# PHOENIX DIVISION

| | |
|---|---|
| Securities and Exchange Commission, | Case No.: |
| Plaintiff, | **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |
| vs. | |
| Park View School, Inc. and Debra Kay Slagle | |
| Defendants. | |

COMPLAINT
Case No.

## SUMMARY OF THE ACTION

1. Plaintiff Securities and Exchange Commission ("SEC" or "Commission") brings this enforcement action against defendant Park View School, Inc. ("Park View"), a state-funded Arizona charter school, and its president, Debra Kay Slagle, in connection with their material misstatements and omissions while raising $7.6 million from investors in an April 2016 bond offering (the "2016 Bonds"). When it sold the 2016 Bonds, Park View was in such dire financial trouble that it could not pay its operating expenses without borrowing heavily. In the years preceding the 2016 Bond Offering, Slagle and Park View had funded Park View's ongoing operations by improperly using money that was set aside in reserve accounts for a prior bond offering in 2011. That 2011 offering had financed Park View's construction of its school facilities ("the 2011 Bonds").

2. When the 2016 Bond Offering took place, Park View and Slagle did not disclose Park View's current financial difficulties to investors in those Bonds. Instead, they authorized an offering document, called an Official Statement (the "2016 Official Statement"), which contained false and misleading financial projections. According to those projections, Park View was reducing its operating losses in the current fiscal year, would be profitable in the upcoming fiscal year, and would be able to repay the bondholders. However, as both Park View and Slagle knew, or were reckless in not knowing, Park View would not be able to meet the financial projections in the 2016 Official Statement unless Park View had implemented a significant expense reduction program – which Park View had not done. Contrary to the 2016 Official Statement's projections, Park View's financial difficulties would preclude it from fulfilling its payment obligations for 2016 Bonds, and meeting its future operating expenses.

3. The months following the 2016 Bond Offering exposed Park View's and Slagle's deceit, resulting in financial losses for investors. Without the necessary expense cutting program, Park View's financial distress continued until

COMPLAINT
Case No.

1

1  Park View defaulted – just a year later in April 2017 – by reducing the interest
2  payments that it made on the 2016 Bonds.
3      4.     As a result of their fraudulent conduct, Defendants have violated and
4  will continue to violate Section 17(a) of the Securities Act of 1933 ("Securities
5  Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")
6  and Rule 10b-5 thereunder.  The Commission therefore seeks an order enjoining
7  Defendants from further violations of the federal securities laws, as well as civil
8  monetary penalties against Slagle and an injunction prohibiting her from
9  participating in future municipal securities offerings.

## JURISDICTION AND VENUE

11     5.     The Court has subject matter jurisdiction over this action pursuant to
12  28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C.
13  §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange
14  Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].
15     6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2),
16  Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the
17  Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise
18  to the alleged violations of the federal securities laws occurred in the District of
19  Arizona.  Pursuant to LRCiv 5.1(a), plaintiff SEC files this Complaint in the
20  Phoenix Division because acts and occurrences giving rise to this action took place
21  in Maricopa County and because Slagle is a resident of Maricopa County.

## FACTUAL ALLEGATIONS

**PARTIES**

24     7.     Defendant Park View is an Arizona nonprofit corporation based in
25  Prescott Valley, Arizona.  Park View is the conduit borrower for the 2016 Bonds,
26  which were issued by the Industrial Development Authority of the County of Pima,
27  Arizona ("Pima Industrial Development Authority").  Under this conduit
28  arrangement, the Pima Industrial Development Authority served only as the

COMPLAINT
Case No.                                     2

nominal issuer of the municipal bonds because it did not use, or have the obligation to repay, the money raised through the 2016 Bond Offering. Instead, Park View received the bond proceeds and was responsible for repaying the 2016 Bonds.

8. Park View operates two charter schools that receive funding from the State of Arizona. Park View's fiscal year and school year run from July 1st through June 30th. As with other state-funded charter schools, the State of Arizona makes twelve payments to Park View based upon the school's reported student enrollment during the school year. Park View must also submit a budget with its anticipated expenses to the Arizona State Board for Charter Schools at the beginning of each school year.

9. Defendant Slagle is a resident of Phoenix, Arizona. From November 2003 to February 2017, Slagle was the President of Park View. In that role, she managed the entity's entire operations, including the preparation of its budgets, all financial matters, and the offering of municipal bonds. Until June 2015, Slagle was also the president of a management company that managed several state-funded charter schools, including Park View, in Arizona. Slagle left Park View in February 2017, and neither she nor the management company has been associated with Park View since that time.

**PARK VIEW'S 2011 BONDS AND FINANCIAL PROBLEMS**

10. In April 2011, Park View was the conduit borrower for a $6.625 million bond offering by the Pima Industrial Development Authority for the purpose of constructing the new building that now houses its two charter schools in Prescott Valley, Arizona.

11. The 2011 Bonds were issued subject to an indenture agreement that governed disbursement of the bond proceeds and repayment of the bond investors (the "2011 Indenture"). The 2011 Indenture provided that the indenture trustee would deposit approximately $248,000 of the 2011 Bond proceeds into an "Operating Reserve Fund" under a trustee's control. The Operating Reserve Fund

provided important protections for investors because it could be used to repay the 2011 Bonds if other reserve accounts were depleted and because money from the Operating Reserve Account could be withdrawn only if the State failed to make a timely payment to Park View or to pay extraordinary unbudgeted expenses, other than salaries.  The 2011 Indenture also called for the creation of a "Repair and Replacement Fund" that was required to have a minimum balance of $125,000.  After depletion of the Operating Reserve Fund, Park View could use the Repair and Replacement Fund for facility repairs and replacement.  If the balances in either reserve account were below the required minimum balance, the Indenture required Park View to replenish the accounts through monthly payments.

12. The Indenture for the 2011 Bonds also required Park View to deposit the State of Arizona's monthly payments into an account under the trustee's control.  After allocating the State's payments to interest and principal payments on the 2011 Bonds, reserve account deposits, and administrative fees, the trustee transferred the remaining money to Park View's operating account for the school's use in paying operating expenses.  Consequently, Park View could timely pay its operating expenses, without additional borrowing, only if the monthly payments it received from the trustee at least equaled, or exceeded, the school's operating expenses.

13. After the 2011 Bond Offering, however, Park View's operating expenses regularly exceeded its monthly payments from the trustee.  To cover its operating expenses and make other payments, Slagle submitted at least twelve request forms between May 2012 and January 2016 to withdraw money from the Operating Reserve Fund.  Nearly all of these withdrawals were impermissible under the 2011 Indenture.  Although Slagle certified in writing to the trustee that each withdrawal was permissible for unbudgeted expenses or repair costs, she knew, or was reckless in not knowing, that the withdrawals were used for routine operating expenses or unauthorized transfers.  For example, in September 2012,

1  Park View received $120,000 from the Operating Reserve Fund and then lent
2  $100,000 the same day to an affiliated charter school, while the remainder of the
3  withdrawal covered checks for items such as student meal services and automobile
4  expenses.

5      14.    Given Park View's financial difficulties, it could not replenish the
6  Operating Reserve Fund after making withdrawals.  In April 2013, Slagle informed
7  the trustee for the 2011 Bonds that Park View would not be able to replenish the
8  Operating Reserve Fund and sought permission to defer repayments "because the
9  monies are necessary for the operation and maintenance of the facilities."

10     15.    Similarly, from June 2013 to January 2016, Slagle submitted at least
11 six withdrawal requests from the Repair and Replacement Fund after Slagle
12 certified in writing that the money was needed for repair and replacement expenses
13 for the facilities.  All but one of these withdrawals were also impermissible under
14 the 2011 Indenture because they were actually used for operating expenses.  Park
15 View was unable to replenish the Repair and Replacement Fund's minimum
16 balance before the 2016 Bond offering.

17 **PARK VIEW'S FINANCIAL CRISIS IN JANUARY 2016**

18     16.    In October 2015, Slagle directed Park View to enter into a series of
19 agreements whereby Park View tried to cover its cash shortages by selling its share
20 of future revenues to a private financing firm.  Pursuant to those agreements, Park
21 View received advances at a high interest rate against future State of Arizona
22 payments.  By January 2016, Park View was essentially out of cash and, owing
23 $400,000, had reached the limit of what the private financing firm would provide.

24     17.    Slagle recognized that Park View might not meet its payroll and other
25 expense obligations in January 2016, and sought additional cash.  Park View could
26 not get a loan or additional advances on its receivables to cover its projected cash
27 shortfall for the remainder of the 2016 fiscal year.

28     18.    To cover some of Park View's pending bills, Slagle submitted four

1  written requests in January 2016 to the trustee for the 2011 Bonds, seeking a total
2  of $31,900 from the Operating Reserve Fund and a total of $46,000 from the
3  Repair and Replacement Fund.  Slagle certified in writing that these requests were
4  for unbudgeted operating expenses or repair and replacement costs.  However,
5  when these four withdrawals (totaling $77,900) were deposited into Park View's
6  operating account, they were primarily used to cover a payment to the private
7  financing firm, to cover payroll, and to pay other operating expenses.

8      19.  A Phoenix-based firm was both the underwriter and "Bondholders
9  Representative" for both the 2011 Bonds and the 2016 Bonds. On January 26,
10 2016, that firm informed the 2011 Bond trustee that it was waiving Park View's
11 obligation to repay the Repair and Replacement Fund for six months because "it is
12 putting a hardship on the school to make these payments."

**PARK VIEW'S FALSE AND MISLEADING OFFICIAL STATEMENT FOR THE 2016 BONDS**

15     20.  Unable to obtain additional cash or loans to pay its expenses and stay
16 afloat, Park View and Slagle decided to seek another bond offering to repay the
17 2011 Bonds and other debt.  The Official Statement for the 2016 Bonds, which
18 served as the investor offering document for the offering, was posted on the
19 Municipal Securities Rulemaking Board's Electronic Municipal Market Access
20 system on April 19, 2016.

21     21.  Slagle signed the Official Statement on behalf of Park View as its
22 President.  In connection with the closing for the 2016 Bond Offering, Slagle also
23 signed certifications that there were no material misrepresentations or omissions in
24 the Official Statement.  In reality, Slagle and Park View made material
25 misstatements and/or concealed material information in the Official Statement.

**Park View's False and Misleading Operating Expense Projections**

27     22.  The 2016 Official Statement falsely or misleadingly represented that
28 Park View would reduce its operating expenses during the 2016 fiscal year, and

1 then later years. The 2016 Official Statement contained audited financial
2 statements for the 2015 fiscal year which stated in Note 12: "***Management of the***
3 ***School is developing a plan to reduce or delay expenses***, increase student
4 enrollment, and, if necessary, borrow additional funds or restructure the debt. The
5 ability of the school to continue as a going concern is dependent on the success
6 with these endeavors." (Emphasis added).

7   23.   Park View made misleading statements about its profitability and
8 ability to repay the 2016 Bonds in a "Feasibility Study" that was attached to the
9 2016 Official Statement.

10  24.   In March 2016, Slagle retained a consultant to prepare the Feasibility
11 Study, which she understood would be part of the 2016 Official Statement and
12 used for the offer and sale of the 2016 Bonds. Shortly after Slagle retained the
13 consultant, she provided Park View's revenue and expense projections for the 2016
14 and 2017 fiscal years, as well as later years, to the consultant for use in the
15 Feasibility Study.

16  25.   The Feasibility Study included all cash operating expenses, including
17 annual bond payments, but did not include the non-cash expenses of depreciation
18 and amortization. By deducting the annual bond expenses from the total operating
19 expenses shown in the Feasibility Study, a reasonable user of the Feasibility Study
20 could derive Park View's projected net operating expense for each fiscal year. For
21 the nearly completed 2016 fiscal year, the Feasibility Study projected a net
22 operating expense number of $1,196,525. For the soon to start 2017 fiscal year,
23 the Feasibility Study projected a net operating expense number that was only
24 slightly reduced, at $1,189,309.

25  26.   The Feasibility Study's projected net operating expenses for 2016 and
26 2017 were significantly lower (in both dollar and percentage terms) than Park
27 View's actual net operating expenses in the immediately preceding 2014 and 2015
28 fiscal years. Additionally, the projected net operating expense for 2016 was nearly

COMPLAINT
Case No.

7

$370,000, or more than 20%, below the net operating expense number that Park View provided in its 2016 budget submitted to the Arizona State Board for Charter Schools.

27.  Moreover, by the time of the 2016 Bond offering, Park View must spend less than $129,000 during the final April through June 2016 quarter to avoid exceeding the projected fiscal 2016 net operating expense figure. That $129,000 expense number for the fourth fiscal quarter was below Park View's essentially fixed expenses for instruction, meal service and transportation for that quarter, and therefore unattainable.

28.  Before agreeing to use Park View's projected operating expense numbers for the Feasibility Study, the consultant told Slagle on multiple occasions that the expense projections required a major cost cutting program in light of Park View's prior financial difficulties. Slagle assured the consultant during a conference call in early April 2016 that she understood the need for cost cutting and would implement an expense reduction plan. Slagle also represented to the consultant in early April 2016 that she was already cutting costs significantly.

29.  Slagle's representations to the consultant of an expense reduction program were false and misleading. Park View did not have the requisite expense reduction program in place at the time of the 2016 Bond Offering. Moreover, when the 2016 Bond Offering closed in mid-April 2016, Park View had not reduced operating expenses to the level contemplated by the Feasibility Study's expense projections. As the official in charge of Park View's finances, budget and accounting, Slagle was aware of these facts.

30.  Because it was far below Park View's historic and budgeted expense numbers as well as the trend of expenses to date at the time of the 2016 Bond Offering, the Feasibility Study's net operating expense number for 2016 was false and misleading in light of Park View's failure to have implemented the necessary cost reduction program. Similarly, in light of Park View's historic expense

numbers and absence of an expense reduction program in April 2016, the Feasibility Study's net operating expense number for 2017 was misleading and lacked any reasonable basis. Indeed, the 2017 budget that Park View submitted to the Arizona State Board for Charter Schools contained an operating expense number that substantially exceeded the Feasibility Study's projections.

**Park View's Misleading Profit Projection**

31. The Feasibility Study used the unreasonably low net operating expense numbers, plus the annual bond expenses, to project Park View's net loss for 2016 and net profit for 2017. According to the Feasibility Study, Park View's net loss in 2016 would decline compared to the prior year to $77,672 and then become a net profit of $42,138 in 2017. The 2016 Official Statement therefore provided investors with the false picture that Park View was implementing a cost cutting program that would reduce the operating loss in fiscal year 2016 and lead to profitability starting with fiscal year 2017. In reality, Park View had much higher losses for the 2016 fiscal year, and continued to lose money during the 2017 fiscal year.

**Park View's Misleading Debt Service Coverage Ratio Projection**

32. The Feasibility Study's net operating expenses and profit for fiscal year 2017 were used to calculate a debt service coverage ratio of 1.1 to 1.0 for 2017. The debt service coverage ratio is an important indicator for investors regarding a borrower's available cash flow and ability to make its debt service payments on offered bonds. A ratio of less than 1 reflects a borrower's inability to service its current debt obligations with net earnings from operations (i.e., revenues minus net operating expenses).

33. According to the consultant who prepared the Feasibility Study, even a $54,000 increase in projected net operating expenses in 2017 would have reduced the 2017 debt service coverage ratio below 1.0, which would have resulted in the consultant's issuing a negative opinion on Park View's financial feasibility.

COMPLAINT
Case No.

9

1 Because Park View's reasonably anticipated and actual net operating expenses for
2 the 2017 fiscal year exceeded the Feasibility Study's projected net operating
3 expenses by over $100,000, Park View could not, and did not, satisfy the 1.1 to 1.0
4 debt service coverage ratio for the 2017 fiscal year.

**Park View's Misleading Breakeven Student Headcount Projection**

34. According to the Feasibility Study, Park View's revenues and expenses would breakeven with a student headcount of 208. In light of its history of actual expenses in prior fiscal years and the current fiscal year through March 2016, the student headcount required for Park View to breakeven on long term revenues and expenses was significantly higher, potentially more than 260 students. The requirement that Park View reach a higher student headcount level to achieve breakeven was material to investors because it showed a greater risk that Park View could not sustain its debt obligations over the long term unless it was much more successful in attracting students.

**Slagle's Knowledge of Park View's Finances**

35. Slagle reviewed Park View's financial statements and approved the 2016 budget that it submitted to the Arizona State Board for Charter Schools. Slagle also approved payments of Park View's bills and frequently reviewed its cash position. She therefore knew, or was reckless in not knowing, that the expense projections in the Feasibility Study were unreasonably low at the time of the 2016 Bond Offering. Slagle also knew, or was reckless in not knowing, that the Feasibility Study's projections of a profit and of a 1.1 to 1.0 debt service coverage ratio in the 2017 fiscal year were not reasonable in light of the absence of a substantial expense reduction program. Slagle similarly knew, or was reckless in not knowing, that the projected breakeven head count of 208 students was too low in light of Park View's expenses.

**Slagle and Park View Did Not Disclose Park View's Misuse of Reserve Accounts**

36. Given Park View's history of losses and failure to control expenses, the 2016 Official Statement's representations regarding the bondholders' repayment protections were particularly important. The 2016 Official Statement described the indenture agreement that was created for the 2016 Bonds (the "2016 Indenture"). Like the 2011 Indenture, the 2016 Indenture established an Operating Reserve Fund and a Repair and Replacement Fund. Also like the 2011 Indenture, the 2016 Indenture used the Operating Reserve Fund as an additional source for payments to bondholders in the event that other debt service accounts were inadequate. Withdrawals from the Operating Reserve Fund were limited to extraordinary unbudgeted expenses to ensure the preservation of its minimum account balance. Similarly, the Repair and Replacement Fund could be used to maintain Park View's school facilities, which were subject to a deed of trust for the benefit of bondholders.

37. Despite the importance of reserve accounts in assuring repayment of the 2016 Bonds, the 2016 Official Statement did not disclose that Park View had repeatedly made reserve account withdrawals in violation of the 2011 Indenture. The omission of this information gave investors a misleading picture of the protections supposedly provided by the 2016 Indenture and the reserve accounts that the Indenture created.

38. Slagle directed the improper withdrawals from the 2011 Bonds' reserve accounts, and knew, or was reckless in not knowing, that those improper transactions were not disclosed in the 2016 Official Statement.

**PARK VIEW'S DEFAULT ON THE 2016 BONDS**

39. Park View's actual expenses during the 2016 and 2017 fiscal years were not reduced, through a cost cutting program or otherwise, down to the level projected in the Feasibility Study. As a result, Park View was unable to pay both

COMPLAINT
Case No.

11

1  its operating expenses and 2016 Bond interest obligations.  Park View depleted the
2  Operating Reserve Account for the 2016 Bonds, as well as its bank accounts, by
3  March 2017.
4       40.    New management took over at Park View in February 2016.  By April
5  2017, Park View requested a Forbearance Agreement and a deferral of interest
6  payments for two years.  Park View's request constituted an event of default under
7  the terms of the 2016 Bonds.
8       41.    In June 2017, investors in the 2016 Bonds were notified that Park
9  View had entered into another Forbearance Agreement for the 2017-2018
10 academic year.  Bond investors were notified that they would be paid interest in
11 July 2017 from debt service and operations reserve funds, but that future payments
12 would be deferred.  Park View has made a few interest payments to investors since
13 that time, but remains in default.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### By Park View and Slagle)

17     42.    The Commission realleges and incorporates by reference paragraphs 1
18 through 41.
19     43.    Park View and Slagle, by engaging in the conduct set forth above,
20 directly or indirectly, by use of means or instrumentalities of interstate commerce,
21 or of the mails, or of a facility of a national security exchange, with scienter:
22 employed devices, schemes, or artifices to defraud; made untrue statements of
23 material fact and omitted to state material facts necessary in order to make the
24 statements made, in light of the circumstances under which they were made, not
25 misleading; and engaged in acts, practices, or courses of business which operated
26 or would operate as a fraud or deceit upon other persons, in connection with the
27 purchase or sale of securities.
28     44.    By reason of the foregoing, Park View and Slagle have directly or

indirectly violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5], and unless restrained and enjoined will continue to violate these provisions.

## SECOND CLAIM FOR RELIEF

**(Violations of Sections 17(a)(1) and (3) of the Securities Act by Park View and Slagle)**

45. The Commission realleges and incorporates by reference paragraphs 1 through 41.

46. Park View and Slagle have, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (1) with scienter, employed devices, schemes, or artifices to defraud; and (2) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

47. By reason of the foregoing, Park View and Slagle have directly or indirectly violated Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (3)] and unless restrained and enjoined will continue to violate these provisions.

## THIRD CLAIM FOR RELIEF

**(Violations of Section 17(a)(2) of the Securities Act by Park View)**

48. The Commission realleges and incorporates by reference paragraphs 1 through 41.

49. Park View has, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

50. By reason of the foregoing, Park View has directly or indirectly violated Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)] and unless restrained and enjoined will continue to violate this provision.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter an Order permanently restraining and enjoining Park View and Slagle from committing the violations of the federal securities laws alleged against them in this Complaint.

### II.

Enter an Order permanently restraining and enjoining Slagle from participating in an offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for the purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security, provided however, that such injunction shall not prevent Slagle from purchasing or selling municipal securities for her own personal account.

### III.

Enter an Order imposing civil money penalties upon Slagle pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. § 77t(d)(1)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Grant such other and further relief, including equitable, as the Court may deem just and proper.

Dated: September 14, 2020

/s/ John S. Yun
JOHN S. YUN
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION